IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Kathleen M. Tafoya**

Civil Action No. 09–cv–01822–WDM–KMT

PREMIER ELECTION SOLUTIONS, INC., f/k/a DIEBOLD ELECTION SYSTEMS, INC.,

      Plaintiff,

v.

SYSTEST LABS INCORPORATED,

      Defendant.

---

## ORDER

---

This matter is before the court on the "Motion of Defendant, SysTest Labs, Inc. to Compel Compliance with Subpoena or, in the Alternative, Motion for Contempt Pursuant to Fed. R. Civ. P. 45" ("Mot.") [Doc. No. 1, filed July 31, 2009]. "Nonparty iBeta Quality Assurance, LLC's Response to Defendant SysTest Labs Incorporated's Motion to Compel" ("Resp.") was filed on August 20, 2009. [Doc. No. 4.] SysTest Labs Inc. ("SysTest") filed a Reply on September 4, 2009 [Doc. No. 6] and a supplemental Reply on September 11, 2009 [Doc. No. 8]. Upon consent of the court, iBeta Quality Assurance, LLC, ("iBeta") filed a Surreply on September 11, 2009. [Doc. No. 10.] The matter came before the court for hearing on September 14, 2009 at which the present motion was taken under advisement. The issues are now ripe for resolution by the court.

*BACKGROUND*

The facts herein are taken from the parties' submissions and from the statements of counsel at oral argument.

This case originates in this District as a Motion to Compel pursuant to a Federal Rule of Civil Procedure, Rule 45 subpoena for documents issued by SysTest, the defendant in an action filed in the United States District Court for the Southern District of New York, Civil Action No. 09 Civ. 00633 ("New York suit").  (Mot. at 1; Resp., Ex. 4.)  The Plaintiff in that action is Premier Election Solutions, Inc., f/k/a Diebold Election Systems, Inc. ("Premier").  Premier is a vendor of voting systems throughout the United States.  (Resp. at 1.)  Premier filed suit against SysTest alleging fraud, negligent performance of professional service obligations, and breach of a Master Professional Services Agreement for Voting Systems.  (*Id*., Ex. 4.)

As a vender of election and voting systems, Premier is required to submit its products for testing to ensure compliance with standards set forth by the U.S. Elections Assistance Commission ("EAC").  (Mot. at ¶ 2; Resp. at 3.)  At the time this dispute arose, SysTest and iBeta were two of four companies in the country certified by the EAC to test voting systems for compliance with EAC standards.   (Resp. at 1.)   Therefore, SysTest and iBeta are direct market competitors.

Originally, Premier retained SysTest to perform the testing required to receive EAC certification of its voting system.  (*Id.*, Ex. 4 at ¶ 5.)  At the end of October, 2008, after SysTest had performed some of the required testing on the Premier system, but before the Premier system had received EAC certification, the EAC suspended SysTest's certification authority.  (*Id.*, Ex.

2

7.)  As a result, Premier retained iBeta to conduct the required testing of its voting system.  (*Id.*,

Ex. 8.)  The New York suit seeks damages Premier alleges it incurred as a result of SysTest's

decertification and Premier's subsequent retention of iBeta to perform the services SysTest was

supposed to provide.  Among the damages are the payments Premier made to iBeta.

SysTest contests Premier's damages calculations, including the necessity of the amounts

paid to iBeta to achieve EAC certification.  (*Id.*, Ex. 5, SysTest Answer and Countercl.) At oral

argument, SysTest stated that after it was decertified, several of its former employees were hired

by iBeta to complete the testing procedures for the Premier system.  SysTest asserts that all

SysTest data and testing was turned over to iBeta to facilitate the completion of the testing.  In

defense of the damages amounts Premier is seeking from SysTest, SysTest served a Rule 45

subpoena on nonparty iBeta at its offices located in Aurora, Colorado.  (Mot., Ex. A.)  The

subpoena requested the production of all documents from January 1, 2008 to the present, relating

or referring to:

1.    The substitution of iBeta, in place of SysTest, to perform election
      equipment/voting systems and/or certification services on behalf of
      Premier; and

2.    All election equipment/voting systems testing and certification services
      performed by iBeta on behalf of Premier; and

3.    The reuse of any election equipment/voting systems testing and/or
      certification services initially performed by SysTest on behalf of Premier.

(Resp., Ex. 9, Subpoena.)

Nonparty iBeta has objected to the production of such documents, and in particular

objects to providing information about some eighteen (18) "test cases," each of which includes

3

approximately one thousand unique testing instructions, and some eleven (11) "trusted builds,"

each of which translates manufacturer voting machine source codes into a format capable of

recognition by a voting machine or system.  Nonparty iBeta contends that

> [t]he trusted builds and test cases requested by SysTest in the Subpoena are
> essentially documentation of a methodology created by iBeta to guide their clients
> through the EAC certification.  It took iBeta and its employees over 1,400 hours
> to develop its methodology for the subpoenaed test cases alone, at a cost of over
> $100,000 to the business.

(*Id*. at 5.)  Nonparty iBeta contends this is confidential commercial information which, if

provided to its competitor SysTest, would disclose iBeta's "blueprint for guiding voting machine

clients through the EAC certification process, something that SysTest has been unable to

accomplish to date."  (*Id*. at 2.)  Nonparty iBeta states that in addition to the sensitive nature of

this trade secret information, two confidentiality agreements with Premier prohibit the

dissemination of much of the subpoenaed information.  (*Id.* at 4.)  Further, iBeta states the

request is overly burdensome and would take a substantial amount of time to compile.  (*Id.* at 5.)

### *LEGAL STANDARD*

Federal Rule of Civil Procedure 26(b)(1) allows broad discovery of "any matter, not

privileged, which is relevant to the claim or defense of any party."  However, Rule 26(c) limits

discovery by allowing the court, for good cause, "to protect a party or person from annoyance,

embarrassment, oppression, or undue burden or expense."  Fed. R. Civ. P. 26(c).  Furthermore, a

court may enter a protective order "requiring that a trade secret or other confidential research,

development, or commercial information not be revealed or be revealed only in a specified way."

Fed. R. Civ. P. 26(c)(1)(G).

4

Fed. R. Civ. P. 45 governs subpoenas issued to nonparties.  The scope of permissible discovery pursuant to Rule 45 is the same as set forth in Rule 26(b)(1)  As Rule 26 makes clear, "for good cause, the court may order discovery of any matter relevant to the subject matter involved in the action."  *Id.*; *see also* Fed. R. Civ. P. 45(d)(1), Adv. Comm. Note ("[t]he changes make it clear that the scope of discovery through a subpoena is the same as that applicable to Rule 34 and other discovery rules.")

On a Motion to Compel nonparty production based on a Rule 45 subpoena, as well as applying the standards of Rule 26, courts also consider the burden on the nonparty, relevance, the requesting party's need for the documents, the breadth of the document request, and the time period covered by the request.  *Echostar Communications Corp. v. News Corp. Ltd.*, 180 F.R.D. 391, 396 (D. Colo. 1998); *see Cytodyne Tech., Inc. v. Biogenic Tech* ., Inc., 216 F.R.D. 533, 535 (M.D. Fla. 2003) (*citing Farnsworth v. Proctor & Gamble Co.*, 758 F.2d 1545 (11th Cir. 1985)). *See also erinMedia, LLC v. Nielsen Media Research, Inc.*, 2007 WL 1970860, at *1–2 (M.D. Fla. 2007).  While the court has considerable discretion with regard to regulating discovery which is exchanged in a lawsuit, discovery from third-parties in particular must, under most circumstances, be closely regulated.  *Echostar,* 180 F.R.D. at 396; *In re Application of Michael Wilson & Partners,* 2009 WL 1193874, at 2–3 (D. Colo. 2009).

### ANALYSIS

#### A.        Range Limitation of Rule 45 Subpoena.

Nonparty iBeta contends that it should be excused from obeying the subpoena because the "actual distance between iBeta's specific address and the place specified by the subpoena to

produce the documents is . . . 117.3 miles." (Resp. at 16.)  SysTest argues that the appropriate

measurement of this distance is 91.517 miles "as the crow flies," or by a straight line drawn

between the two addresses as calculated by Global Positioning Satellites.  (Mot. at 3.)  Both

sides rely on Federal Rule of Civil Procedure 45(c)(3)(A)(ii) which requires a court to "quash or

modify a subpoena that . . . requires **a person** who is neither a party nor a party's officer **to**

**travel** more than 100 miles from where that person resides, is employed, or regularly transacts

business in person."  Nonparty iBeta contends that "[a] nonparty's failure to obey must be

excused if the subpoena purports to require the nonparty to attend or produce at a place outside

the limits of Rule 45(c)(3)(A)(ii)."  Fed. R. Civ. P. 45(e).

The court finds Rule 45(c)(3)(A)(ii)'s 100-mile range limitation inapplicable to the case

at bar.  First, as stated in the subpoena itself, "[a] person commanded to produce documents . . .

need not appear in person at the place of production . . . unless also commanded to appear for a

deposition, hearing, or trial."  Fed. R. Civ. P. 45(c)(2)(A).  Nonparty iBeta has not been

commanded to appear for a deposition, hearing or trial in this matter, but only to produce

documents.  Furthermore, iBeta's production of documents thus far in response to SysTest's

subpoena has been by email and regular mail (Resp., Ex. 20, Attach. A), and there is no

indication that iBeta intends to travel anywhere to produce any other documents.  Since the

subpoena does not require any representative of iBeta to travel anywhere, much less beyond

Rule 45's 100-mile limitation, iBeta is not excused from obeying the subpoena on this basis.  *See*

*Ice Corp. v. Hamilton Sundstrand Corp.*, 2007 WL 1364984, at *3 (D. Kan. 2007) (quoting

*Stewart v. Mitchell Transport*, 2002 WL 1558210, at *3 (D. Kan. 2002) (declining to quash the

subpoena at issue because the subpoenas did not require any of the entities served to travel in violation of Rule 45's 100-mile limitation.)); *Tubar v. Clift*, 2007 WL 214260 (W.D. Wash. 2007) (even though Rule 45(b)(2) requires service within 100 miles of the place of production or copying of records, a subpoena served in New Jersey for the production of documents in Washington nonetheless was enforced because, pursuant to Rule 45(c)(2)(A), no individual was required to escort the requested records personally); *Jett v. Penner*, 2007 WL 127790 (E.D. Cal. 2007) (a request for a file was not quashed, although the file was located more than 100 miles away because the request was only for the file itself and there was no requirement that a nonparty travel more than 100 miles in order to supply it).

If Rule 45(c)(3)(A)(ii) were applicable to this case, the Tenth Circuit does not appear to have addressed whether the 100-mile limit is to be calculated by the ordinary means of travel or by the straight-line approach.  However, the District Court for the District of Idaho, in an unreported 2007 case, applied the straight line approach to service of trial subpoenas under Rule 45(b)(2).  *See Weerheim v. J.R. Simplot Co.*, 2007 WL 2121925, at *1 (D. Id. 2007).  That court reasoned that

> the modern trend is to measure the distance in a straight line so that the area in which service can be made can be indicated by a circle with the place of trial as its center and the 100 miles represented as the circle's radius.  Measurement in this manner has the additional advantage of eliminating controversy as to what is the ordinary means of public travel and the usual route to the place of service.

*Id.* at *1 (quoting 4B CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE &

PROCEDURE, § 1127 at p. 260, n. 1 (2002) (commentary regarding service under Rule 4)).[1]

Kansas, too, has held "the proper interpretation of Rule 45(b)(2) is to measure the 100 mile rule

by a straight line on a map." *Cook v. Atchison, Topeka & Santa Fe Ry. Co.*, 816 F. Supp. 667,

669 (D. Kan. 1993) (citing *Hill v. Equitable Bank*, 115 F.R.D. 184, 186 (D. Del. 1987)).

In accordance with the forgoing sparse but persuasive authority, this court finds that the

proper measurement of the 100-mile limit under Fed. R. Civ. P. 45(c)(3)(A)(ii) is by a straight

line drawn between the two addresses.  Consequently, the 100 mile limitation would not be

violated even if it were applicable in this case.

### B.      Timeliness of iBeta's Objections.

A person commanded to produce documents may serve on the party designated in the

subpoena written objections to producing the requested documents.  Fed. R. Civ. P. 45(c)(2)(B).

Such objections must be served before the <u>earlier</u> of the time specified for compliance or 14 days

after the subpoena is served.  *Id.*  Nonparty iBeta was served with the subpoena on July 1, 2009.

(Mot., Ex. A at 1.)  The time specified for compliance was set for July 17, 2009 (*id.* at 2),

therefore, objections were due July 15, 2009, the earlier of the two dates.  Nonparty iBeta filed

its written objections on July 16, 2009 (Resp. at 17; Ex. 1), one day out of time.  SysTest

---

[1] In another section of their multi-volume work specifically directed to Rule 45 subpoenas, Wright and Miller state that "[t]here is some older case authority that the 100-mile distance is to be measured by the ordinary, usual, and shortest route of public travel, even though it would be simpler and would cause less argument and ambiguity to measure that distance by a straight line as a larger number of district courts now appear to do."  9A CHARLES A. WRIGHT AND ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE, § 2461.

contends that iBeta's failure constitutes a bar to consideration of these objections.  (Mot. at 3.) Nonparty iBeta urges the court to consider its objections to the subpoena despite their untimely filing based on unusual circumstances and good cause shown.

Some courts have recognized that, "[i]n unusual circumstances and for good cause, . . . the failure to act timely will not bar consideration of objections."  *American Elec. Power Co. v. U.S.*, 191 F.R.D. 132, 136–37 (S.D. Ohio 1999); *Concord Boat Corp. v. Brunswick Corp.*, 169 F.R.D. 44, 48 (S.D. N.Y. 1996)).  Such unusual circumstances have been found in cases where (1) the subpoena is overbroad on its face and exceeded the bounds of fair discovery, (2) the subpoenaed witness is a nonparty acting in good faith, and (3) counsel for the witness and counsel for the subpoenaing party were in contact concerning the witness' compliance prior to the time the witness challenged the legal basis for the subpoena.  *See American Elec.*, 191 F.R.D. at 137; *Concord*, 169 F.R.D. at 48.

SysTest urges a strict application of Rule 45, relying on an unreported case from this District, *United States v. Davison*, 2009 WL 189957 (D. Colo. 2009), to argue the unusual circumstances exception to Rule 45 is inapplicable in the District of Colorado.  However, this court disagrees with SysTest's reading of *Davison*.  The *Davison* court merely stated that it had "found no case in this jurisdiction in which the court recognize[d] [the unusual circumstances] exception[] to waiver for untimeliness."  *Id.* at *2.  Nevertheless, the *Davison* court considered the particular circumstances in the case before it and found that, "even if our courts recognized the exception, the necessary 'unusual circumstances' do not exist in this case."  *Id.*  Notably, the

9

*Davison* court did not reject the unusual circumstances exception, nor has this court's investigation revealed such a rejection by any other court in this jurisdiction.

In this case, largely because of the overwhelming prejudice which would accrue to iBeta by a strict application of the timing provision in Rule 45, this court finds that unusual circumstances do exist, and that failure of this court to consider iBeta's objections filed one day out of time would result in manifest injustice. This court's overarching responsibility is to "secure the just . . . determination of every action and proceeding." Fed. R. Civ. P. 1. Further, "when an act may or must be done within a specified time, the court may, for good cause, extend the time . . . after the time has expired if the party failed to act because of excusable neglect." Fed. R. Civ. P. 6(b)(1)(B).

I note that several of the factors which have been considered by other courts to excuse an untimely filing of objections under Rule 45 exist in this case as well. As discussed *infra*, the subpoena seeks the production of numerous "test cases" and "trusted builds" from iBeta which, as discussed *infra*, I find to be highly confidential trade secret information, the dissemination of which would cause a substantial detriment to iBeta's business. There appears to be no dispute that this information constitutes the "nuts and bolts" of the services iBeta provided to Premier. At oral argument, SysTest repeatedly asserted, but with an inability to articulate precisely why, this detailed, sensitive information was necessary to its defense against Premier in the New York suit. This court seriously questions the relevancy of this information to SysTest's defense, particularly in light of production of the Premier voluminous Test Report. (Resp. at 19.)

10

Additionally, iBeta is a nonparty to the underlying litigation. While this status does not relieve iBeta of its obligations either to respond to proper discovery requests or to comply with the applicable rules, it does entitle iBeta to consideration regarding expense and inconvenience. *See* Fed. R. Civ. P. 45(c)(2)(B)(ii) (an "order [compelling production] must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance"). iBeta claims the information called for by the subpoena, redacted to protect trade secret information, "would require iBeta to devote ten to twelve full working days to retrieve and review," and likely cause substantial cost and disruption to iBeta's business.  (Resp. at 19.) This court agrees with the *Concord* court that, "[t]o the extent a subpoena sweepingly pursues material with little apparent or likely relevance to the subject matter it runs the greater risk of being found overbroad and unreasonable."  169 F.R.D. at 50.

Further, I find no indication that iBeta has acted in bad faith.  The subpoena was undisputedly served upon iBeta on July 1, 2009, but at oral argument counsel for iBeta revealed that the subpoena was not delivered to iBeta's counsel until July 13, 2009.  It is also undisputed that the subpoena itself required production of documents on or before July 17, 2009.  Earl Wing, vice president and chief financial officer of iBeta, states that he was served with the SysTest subpoena in "early July, 2009."  (Resp., Ex. 10, ¶ 12.)  iBeta contends, and SysTest does not dispute, that upon receiving the subpoena, Mr. Wing contacted Dave Byrd, President of Premier, who advised him, "the parties were moving toward settlement at an upcoming mediation" on July 9, 2009.  (Resp. at 17.)  According to iBeta, from July 1, 2009 to July 13, 2009, "it appeared that production of the [subpoenaed] documents would not be necessary and

11

that work toward producing [them] would be for naught." (*Id.*)  Mr. Wing was not advised until July 13, 2009 that the settlement efforts were unsuccessful.  (*Id.*)

Counsel for iBeta served SysTest with written objections on July 16, 2009, a date which appeared from the face of the subpoena to be one day prior to when such objections would be due.  In reality, of course, the objections were filed one day after the passage of the fourteen day deadline.  According to iBeta, and again not disputed by SysTest, prior to submitting its written objections on July 16, 2009, iBeta's counsel conferred with counsel for SysTest twice by telephone to discuss iBeta's compliance with the subpoena, the possibility of receiving an extension, and/or receiving a limitation on the information sought.  (*Id.*)  iBeta served its written objections after these discussions failed to produce progress.  (*Id.*)  Even after the objections were served, iBeta produced many of the subpoenaed documents, continued to negotiate this dispute with counsel for Premier and SysTest, and purports to be currently preparing another round of disclosures.[2]

The absence of any showing of intentional failure to disclose or bad faith, iBeta's status as a nonparty, the reported probability of settlement of the underlying case, an intervening holiday with no "received" stamp or other document indicating the date of receipt of the subpoena for guidance to iBeta's attorney, together with iBeta's (albeit untimely) partial

---

[2] At oral argument, counsel for iBeta stated that all 3,000 relevant email communications would be produced, redacted as appropriate and with a privilege log, by no later than September 21, 2009.

production of documents, all weigh in favor of finding that iBeta acted in good faith in response to SysTest's subpoena.

In light of the forgoing circumstances, the court finds that iBeta's failure to strictly comply with Rule 45's time limits is excusable.  This court agrees with the court in *Concord*, that "'[s]uch a strict interpretation of the Rule would discourage informal dispute resolution among parties who cause issuance of *subpoenas duces tecum* and those to whom the subpoenas are issued,' a result that 'certainly would work against the efficient administration of justice.'" *Concord*, 169 F.R.D. at 52 (quoting *In re Goodyear Tire & Rubber Co. Securities Litigation*, 1991 WL 172930, at *1 (N.D. Ohio 1991)).  Accordingly, due to the unusual circumstances present in this case, and for good cause shown, the court finds that iBeta's failure to act timely does not bar consideration of its objections to SysTest's subpoena.

### C.    *Trade Secret Information*.

iBeta has resisted production of a portion of the requested discovery claiming that the "test cases" and "trusted builds" information constitutes highly confidential, competitive trade secrets.  "What constitutes a 'trade secret' is a question of fact for the trial court."  *Haggard v. Spine*, 2009 WL 1655030, *7 (D. Colo. 2009) (Arguello, J.); *Gates Rubber Co. v. Bando Chemical Industries, Ltd.*, 9 F.3d 823, 848 (10th Cir. 1993).  A "trade secret" is defined in the Colorado Uniform Trade Secrets Act, Colo. Rev. Stat. §§ 7-74-101 to 7-74-110 as follows:

> "Trade secret" means the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, improvement, confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value.  To be a "trade secret" the owner thereof must have

> taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes.

Colo. Rev. Stat. § 7-74-102.  The fact that certain components of information are well-known or publicly available does not preclude trade secret protection.  If the combination or organization of the information is unique and offers the compiler of the information a competitive advantage, it is protectable.  *Haggard*, 2009 WL 1655030 at *7 (protection sought for a compilation of customer data and product development information in a medical implant and device business); *see also Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1129 (10th Cir. 2003) (protection sought for a software system that integrated several variables available in the public domain in a manner and with a result that deserved trade secret protection).  "A trade secret can exist in a combination of characteristics and components each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret."  *Rivendell Forest Prods., Ltd. v. Georgia-Pacific Corp.*, 28 F.3d 1042, 1045 (10th Cir. 1994); *Hertz v. Luzenac Group*, 576 F.3d 1103, 1110 (10th Cir. 2009).

Factors considered by courts in determining whether a trade secret exists include: (1) the extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, i.e., by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and

expense it would take for others to acquire and duplicate the information.  *Harvey Barnett, Inc.*, 338 F.3d at 1129.

Confidential information that may be used against the company by a direct competitor is generally afforded more protection.  *Covelo Clothing, Inc. v. Atlandia Imports, Inc*., 2007 WL 4287731, *1 (D. Colo. 2007); *see also A/R Roofing, L.L.C. v. Certainteed Corp.*, 2005 U.S. Dist. LEXIS 31145 (D. Kan. 2005) (finding that disclosure of information that could place one party at a disadvantage in the marketplace supported an attorney-eyes-only provision); *Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, 529 F. Supp. 866 (E. D. Pa. 1981) ("Competitive disadvantage is a type of harm cognizable under Rule 26.").

To carry the good cause burden under Fed. R. Civ. P. 26(c)(7), a party must first establish that the information for which they seek protection is a trade secret or other confidential research, development, or commercial information and then demonstrate that its disclosure might be harmful.  *Centurion Indus., Inc. v. Warren Steurer & Assocs.*, 665 F.2d 323, 325–26 (10th Cir. 1981); *R & D Business Systems v. Xerox Corp.*, 152 F.R.D. 195, 196 (D. Colo. 1993).  If those requirements are met, the burden then shifts to the party seeking discovery to establish that disclosure of a trade secret or other confidential information is relevant and necessary to the action.  *Id.*  The district court must balance the need for discovery of the trade secrets against the claim of injury resulting from disclosure.  *Id.*; *see A Major Difference, Inc. v. Wellspring Products, LLC*,  243 F.R.D. 415, 416–17 (D. Colo. 2006).

> **1.     Data related to the eighteen "test cases" and eleven "trusted builds" qualifies as trade secret information entitled to court protection.**

iBeta does not seek relief from the subpoena in its entirety, but rather seeks to protect only the data which is part of their eighteen "test cases" and eleven "trusted builds." The "test case" and "trusted build" data is "documentation of a methodology created by iBeta" to test and guide manufacturers of voting systems to achieve certification of their products from the EAC. (Resp. at 11.) There are only four companies which have been certified by the EAC to test voter systems against EAC criteria and ensure compliance.[3] (*Id.*) Only one company, iBeta, has been able to lead a voter system manufacturer through successful EAC certification. (*Id*. at 12.) Nonparty iBeta did so by application of its "test cases" and "trusted builds" methodology, among other things, which were developed over a one year period at a cost of $100,000.00 and approximately 1,400 hours of employee labor. (*Id.*) One of the grounds for SysTest's decertification by the EAC was that SysTest's testing methodologies "were not fully developed, validated, mapped to the requirements of the applicable standards, and controlled under SysTest's document control policy." (*Id.*, Ex. 7, Attach.1.) Obviously, iBeta's proprietary interest in its own processes which have withstood EAC scrutiny are extraordinarily sensitive and valuable to iBeta. Only iBeta is privy to the exact parameters of a methodology which can help a manufacturer meet the EAC requirements for certification. The information for which iBeta seeks protection is not known outside of iBeta itself, except as necessary in the confines of its relationships with the voter system manufacturers.

---

[3]      SysTest regained its certification from EAC in 2009.

Further, iBeta has taken precautions to ensure that its processes are not revealed.  iBeta required Premier to enter into a Mutual Confidentiality Agreement on February 5, 2007 before performing any work on Premier's voter system.  (*Id.*, Ex. 11.)  iBeta and Premier also entered into a Voting Certification Master Services Agreement on October 29, 2008, which provides that neither party will "provide, disclose, sell, or otherwise make available any item of Confidential Information, including information concerning this Agreement, a party's business, clients, . . . personnel, technical, financial, operational or strategic information as well as all notes, analyses, compilations, interpretations, or other documents."  (*Id.*, Ex. 12.)  These two agreements demonstrate iBeta's insistence on safeguarding its confidential information.

This court, therefore, concludes that all information and documentation which could reveal the data contained in the "test cases" and "trusted builds" is trade secret information belonging to nonparty iBeta and is entitled to protection by this court.

> **2.      *SysTest has not established that data and information related to or revealing the "test cases" and the "trusted builds" is relevant and necessary.***

Having established that trade secret or otherwise confidential information has been sought, the burden shifts to SysTest to establish "that disclosure of the trade secrets is both relevant and necessary."  *Echostar*, 180 F.R.D. at 394; *R & D Business Systems*, 152 F.R.D. at 197.  SysTest must prove that it has a "substantial need" for the discovery which "cannot be otherwise met without undue hardship . . . ."  Fed. R. Civ. P. 45(c)(3)(B)(iii).  The court must then "balance the need for the disclosure against the injury that would result from that disclosure."  *Echostar*, 180 F.R.D. at 394; *R & D Business Systems*, 152 F.R.D. at 197.

17

SysTest's Motion does not attempt to show a substantial need for the discovery of iBeta's trade secret information.  However, when questioned by the court at the hearing, SysTest stated that among Premier's claimed damages in the underlying case is a claim for the money Premier paid iBeta to complete the testing process when SysTest lost its certification.  SysTest, through its counsel, claims it needs the "test cases" and "trusted build" information to ascertain what, if any, information and testing data previously done by SysTest was reused by iBeta, exactly what products were tested and whether equipment changes might have increased the costs for iBeta's services.

Thus far, iBeta has disclosed the complete Test Report on the Premier voting system, which consists of over 400 pages of information about the testing done on the system.  However, Traci Mapps, SysTest's Director of Voting System Test Laboratory Operations, claims that Premier's Test Report is insufficient to allow SysTest to determine whether testing work done by iBeta was a "re-do" of work previously done by SysTest or work that would have had to have been performed by SysTest at some point in the process regardless of the suspension of its EAC certification.  (Reply, Doc. No. 6, Ex. C.)  Ms. Mapps claims that the disclosure of iBeta's confidential information would allow SysTest to ascertain when work was performed due to

a.   changes to source code, thus requiring additional trusted builds and/or test cases and/or other retesting;
b.   hardware changes that would have required retesting;
c.   evolution of EAC program and guidelines during the certification/testing process;
d.   other testing which was not completed prior to the temporary suspension; and

       e.       regression testing against portions of the system that were not directly modified in order to validate any changes.

(*Id*. at ¶ 11.)  Ms. Mapps states that the primary focus of the information sought goes to "the alleged 're-do' of work by iBeta."  (*Id*. at ¶ 14.)

       iBeta, in response, has presented evidence showing that, with limited exceptions, the EAC prohibited iBeta's reuse of any information or testing data previously performed by SysTest.[4]  (Resp., Ex. 19.)  Therefore, even if iBeta had engaged in a "re-do" of work performed previously by SysTest, unless the work related to the three areas where the EAC allowed reuse of SysTest work, the "re-do" was required to achieve EAC certification for the Premier voting system.  Therefore, the information concerning whether certain testing was a "re-do" would not reduce the damages claimed by Premier because there would be no eligibility for sort of set-off.  Without the possibility of a reduction in damages, there does not appear to be any relevance of the information in the "test cases" and "trusted builds."  Further, SysTest has not persuaded the court, either at oral argument or in its briefing, that it has exhausted all other avenues for acquiring the information which is relevant to defend against the damages claims.

       In light of the minimal relevancy of the information contained within iBeta's "test cases" and "trusted builds" to the underlying case, SysTest's insistence upon production of this material is cause for alarm to this court given SysTest's market position *vis-a-vis* iBeta.  It is "axiomatic that a party cannot take discovery for purposes unrelated to the lawsuit at hand."  *Echostar*, 180

---

    [4] These limited exceptions were allowed for "hardware, Technical Data Package and source code" only after review by iBeta and approval from the EAC.  (Resp., Ex. 19.)

F.R.D. at 396 (internal quotations omitted).  SysTest's discovery requests to iBeta, a non-party, are broad and undeniably request production of trade secret information—the "test cases" and "trusted builds" data—which is, at best, only marginally relevant, if at all.  Like the court in *Echostar*, this court harbors "a healthy suspicion that [SysTest] is seeking discovery from the subpoenaed non-part[y] for purposes which are unrelated to the present litigation."  *Echostar*, 180 F.R.D. at 396.

Accordingly, I find that the balance between SysTest's need for the discovery and the harm that production will do to iBeta in the competitive marketplace weighs overwhelmingly in favor of full protection of  iBeta's trade secret data contained in the "test cases" and the "trusted builds."  I find that production of the data pursuant to a protective order will not adequately protect iBeta and that an Order barring production of the information is appropriate.

Therefore, it is **ORDERED**

1.      The "Motion of Defendant, SysTest Labs, Inc. to Compel Compliance with Subpoena or, in the alternative, Motion for Contempt Pursuant to Fed. R. Civ. P. 45" [Doc. No. 1] is **GRANTED in part and DENIED in part** as follows:

   a.      The motion is **DENIED** to the extent the requested production calls for documents or "electronically stored information, correspondence and invoices" or other data revealing the contents of iBeta's "test cases" or "trusted builds;" and

   b.      The motion is otherwise **GRANTED**.

It is further **ORDERED**

2.      iBeta will produce all remaining documents and other data consistent with this

Order on or before October 6, 2009.

Dated this 22nd day of September, 2009.

                                        **BY THE COURT:**

                                        _____
                                        Kathleen M. Tafoya
                                        United States Magistrate Judge

21